905 F.2d 1528
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
George G. ALSTON, Plaintiff-Appellant,
v.
DANVILLE KENNEL CLUB, INC., Defendant-Appellee.
 No. 89-3210.
 United States Court of Appeals, Fourth Circuit.
 Argued: Nov. 1, 1989.
Decided May 15, 1990.
 
 Appeal from the United States District Court for the Western District of Virginia, at Danville. Jackson L. Kiser, District Judge. (CA-88-26-D)
 Robert Parker Vines, Vansant, Millner & Vines, Chatham, Va., for appellant.
 David Nicholas Grimes, Warren, Parker, Williams, Stillwell and Morrison, Danville, Va., for appellee.
 W.D.Va.
 AFFIRMED.
 Before WIDENER and WILKINSON, Circuit Judges, and HIRAM H. WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 The appellant, George Alston, appeals from the district court's grant of summary judgment to Danville Kennel Club. We find that court's analysis without reversible error, and we affirm.
 
 
 2
 On September 30, 1986, Alston, a professional dog handler, was participating in a dog show in Danville, Virginia. The show was held under a series of tents. The show rings were not in good condition the day of the show because the surface of the rings was covered with loose crushed rocks ranging from 3/4 of an inch up to 2 1/2 inches in size. Usually, show rings are made of hard surfaces such as concrete or asphalt, or are on grass. The rocks made walking difficult and thus hampered the showing of the dogs.
 
 
 3
 Alston noticed the conditions the morning of the show and complained but the rocks were not removed. Nevertheless, Alston continued to show the dogs he had entered. That afternoon, another dog handler stepped into a large hole and fell in one of the rings. A chair was placed over the hole. Later, the chair was removed and Alston refused to go into the ring until the chair was replaced. Around 4:30 p.m., after showing a dozen or so times, Alston slipped on a rock in the ring and sprained his ankle. It is for the sprained ankle that he sues.
 
 
 4
 Alston's full time occupation is training, trimming, conditioning and showing dogs. At each show, he charges between $60 and $150 per dog, plus expenses. If a dog wins a prize, Alston receives a bonus. In the Danville show, Alston was to show twelve dogs for which he would receive $60 per dog. The entry fee for each dog, which he bills in addition to the showing charge, was about $15 per dog. Under the rules of the American Kennel Club, Alston had to show the dogs he entered or he could not recover the entry fees he had already paid for those dogs, and he would not have earned a fee for showing the dogs.
 
 
 5
 Alston filed suit in the district court claiming negligence on the part of the kennel club, which moved for summary judgment, arguing that Alston fully appreciated the risk associated with the loose gravel in the show rings and voluntarily assumed that risk when he entered the ring. Relying on the Restatement (Second) of Torts Sec. 496E,[1] he claimed that his conduct in entering the ring in spite of his knowledge of the bad conditions was involuntary because, if he had not shown dogs that day, he would have lost money. Thus, the district court's decision centered on whether Alston voluntarily entered the ring as well as any prospective loss.
 
 
 6
 The lower court considered cases which held that workers who had undertaken dangerous tasks at the instruction of their superiors had not acted voluntarily. And, instead of placing Alston in the category of an employee who had been given the choice between assuming the risk of the danger at hand or losing his job, it compared Alston with an independent contractor who can decline a job that does not suit him. This accurate comparison distinguished Alston from the employer-employee cases, for Alston could have refused to go into the ring. While he might have lost money by refusing to do so, he would not, however, have lost his job.
 
 
 7
 The lower court also distinguished Alston's case from the rescue cases in which the alternate to encountering a known danger is the unreasonable risk of loss of life or substantial property. The only thing Alston risked by not showing the dogs was a loss of money. The district court stated that if Alston had refused to show the dogs that day in Danville, he "was unlikely to lose more than $1,500.00." The court concluded by stating:
 
 
 8
 This is not a small amount of money, but when it is placed in the context of Alston's $200,000 gross income, the loss would certainly not be crippling (not as crippling as the physical injury turned out to be). Under the circumstances, Alston's economic duress was minimal and does not eliminate his assumption of the risk of slipping and falling in the show rings. He had a reasonable, only moderately inconvenient alternative--he could sue the DKC for his losses. As a matter of law, it was unreasonable for Alston to walk into a dangerous situation, when there was no compelling reason to do so. Therefore, Alston voluntarily assumed the risk of slipping and falling in the show rings, and he cannot recover damages from the Danville Kennel Club.
 
 
 9
 Accordingly, the court granted summary judgment for Danville Kennel Club.
 
 
 10
 On appeal, Alston does not contend that he did not know the conditions of the grounds. His only assignment of error is that his assumption of the risk was not voluntary; the loss in income he would have suffered by not showing the dogs left him with the economic necessity of entering the ring. He does not dispute the fact that his losses would be limited to $1,500 or that his gross income is $200,000.[2] Rather, he contends that the potential $1,500 loss should have been compared to $40,000, the income he paid taxes on. His argument continues that, in light of his income, accepting the loss by not entering the ring would have been unreasonable.
 
 
 11
 Alston's taxable income, however, does not have a great bearing on the inquiry. The district court considered the potential $1,500 loss in comparison to Alston's gross income to gauge the degree of economic duress if any existed at all. The basic reasoning of the court's decision, however, is the reasonable alternative Alston had available. In the words of the lower court, "Alston's remedy was to refuse to show the dog in the rocky show rings and to sue for breach of contract for his losses." With the existence of a reasonable alternative, Alston's conduct in entering the ring was voluntary. He therefore assumed the risk of injury. He testified, indeed, that it "is true" that "it was worth the risk in order to go for the prize money."
 
 
 12
 Reviewing the evidence and all reasonable inferences in favor of Alston, we do not see that he has presented sufficient evidence for a jury to return a verdict in his favor. We agree with the lower court that the economic duress Alston suffered, if any, was only minimal. More importantly, we concur with the district court that Alston assumed a known risk and had a reasonable alternative, to sue for damages.
 
 
 13
 The judgment of the district court is accordingly
 
 
 14
 AFFIRMED.
 
 
 
 [1]
 The Restatement (Second) of Torts Sec. 496E states:
 (1) A plaintiff does not assume a risk of harm unless he voluntarily accepts the risk.
 (2) The plaintiff's acceptance of a risk is not voluntary if the defendant's tortious conduct has left him no reasonable alternative course of conduct in order to
 (a) avert harm to himself or another, or
 (b) exercise or protect a right or privilege of which the defendant has no right to deprive him.
 The Virginia Supreme Court cited this view with approval in Van Collom v. Johnson, 228 Va. 103, 319 S.E.2d 745, 746 (1984).
 
 
 [2]
 We pause to note that the district court judge was generous in his estimation of the losses Alston would have incurred had he not shown the dogs. Indeed, it seems to have considered the losses that Alston would have incurred had he arrived in Danville, evaluated the ring as unsafe and gone home. It took into account Alston's expected fees, costs of travel, entry fees already paid and possible bonuses for all the dogs. Alston, however, had been showing dogs all day and the competition started at 9:00 a.m. His injury occurred late in the afternoon. Thus, he had already earned his fees for the dogs shown earlier in the day. Each time he entered the ring was an event independent of the previous round. By 4:30 p.m., his losses had diminished because he had already shown some of the dogs, and he entered the ring for a potential $150 in bonuses. Each time he entered a ring to show a dog, his potential financial losses decreased while his familiarity with the conditions of the ring increased